---

(No. 13837.—Reversed and remanded.)
WYMER SCHLOSSER, Appellee, *vs.* THE SANITARY DISTRICT OF CHICAGO, Appellant.

*Opinion filed June 22, 1921—Rehearing denied October 7, 1921.*

1. SANITARY DISTRICTS—*action for damages arising from operation of a sanitary district must be brought within five years from completion of work.* In an action for permanent injury to land caused by the existence, operation and use of the drainage canal of a sanitary district all damages must be recovered in a single suit, and that suit must be brought within five years after completion of the work and putting it in operation in the manner and to the amount authorized by law.

2. SAME—*when action for damages from overflow is barred.* An action for damages to land caused by turning the water of the canal of the Sanitary District of Chicago into the Illinois river is barred where the evidence shows the action was not brought within five years from the time the water first invaded the plaintiff's land, which was the issue raised by the pleadings, even though the full extent of the damage was not then apparent.

APPEAL from the Circuit Court of Marshall county; the Hon. THEODORE N. GREEN, Judge, presiding.

WILLIAM F. MULVIHILL, and WALTER E. BEEBE, (JOHN DAILEY, MORTON S. CRESSY, and PRESTON CLARK, of counsel,) for appellant.

R. MAGOON BARNES, JAY H. MAGOON, and WALLACE J. BLACK, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

This appeal by the Sanitary District of Chicago from a judgment of $2500 recovered in the circuit court of Marshall county by Wymer Schlosser is brought directly to this court because the plaintiff's title is put in issue by the pleadings and therefore a freehold is involved.

The suit was begun on January 30, 1905, and the declaration consisted of twelve counts, each charging permanent injury to the plaintiff's land caused by the operation and construction of the sanitary district channel; that by the lowering of the bear-trap dam at Lockport the sanitary district permitted the waters of Lake Michigan to pass through the drainage channel into the Desplaines and Illinois rivers, and thereby the land of the plaintiff was submerged and damaged. Besides the plea denying title the defendant filed a plea of the general issue and another of the five year Statute of Limitations. To the plea of the Statute of Limitations the plaintiff replied that the waters were turned into the Desplaines river by the sanitary district on January 17, 1900; that the plaintiff's land is situated more than 100 miles from the place where the waters were so turned in; that none of the waters so turned in by the sanitary district did reach, overflow or go upon any of the lands of the plaintiff prior to the first day of February, 1900; that plaintiff was not bound to commence any suit for the damages described in his declaration prior to the date that the waters of the sanitary district had actually physically damaged and injured his land; that the fair cash market value of his land was not depreciated, injured or

damaged until the waters reached his land, and that he did commence his suit within five years after the time any of said waters in any manner damaged or injured his land and did depreciate the fair cash market value thereof.  A demurrer to the replications was overruled.  Thereupon the defendant rejoined that the waters in the declaration mentioned were first caused to flow into the Desplaines and Illinois rivers on January 17, 1900, and reached, flowed by and invaded, if at all, the plaintiff's land on January 17, 1900; that the injury and damage set forth in the plaintiff's declaration, if any such occurred by any act of the defendant, arose, if at all, on January 17, 1900, when the waters of the defendant were first turned from its main channel and caused to flow into the Desplaines and Illinois rivers, and reached, flowed by and invaded, if at all, the land of the plaintiff.  Two other rejoinders were filed which need not be noticed.  The plaintiff filed a sur-rejoinder to the replication which has been stated, saying that the waters did not on January 17, 1900, overflow or invade, and had not before that time reached, overflowed or invaded, any of the land in the plaintiff's declaration mentioned, and that the damage set forth in the declaration did not accrue to said land on January 17, 1900, because of any act of the defendant before that time done, and that the cause of action sued for in the plaintiff's declaration did not accrue to the plaintiff more than five years before the commencement of the suit.

The demurrer having been overruled to the replication which averred that the water was turned into the river on January 17, 1900, but did not reach, overflow or go upon any of the land of the plaintiff prior to the first day of February, 1900, must have been based upon the view that the cause of action did not arise at the time the water was turned into the river on January 17 but at the time it reached and overflowed the plaintiff's land, and on the trial the jury were instructed according to this view.  The ap-

pellant not having stood by its demurrer but having pleaded over, cannot now question the ruling of the court on its demurrer, as it attempted to do by the two rejoinders whose contents have not been stated. The first rejoinder, however, averred that the water reached, flowed by and invaded the plaintiff's land on January 17, 1900, and the sur-rejoinder took issue on this question of fact. So far as the Statute of Limitations is concerned, therefore, the only issue in the case was whether the waters of the sanitary district let into the Desplaines and Illinois rivers reached and overflowed the land of the appellee more than five years before the commencement of the suit. The court instructed the jury that if they did so the jury should find a verdict for the defendant. The appellant asked an instruction for a verdict in its favor, which the court refused. This instruction should have been given.

The evidence in regard to the time when the waters from the sanitary district reached and affected the appellee's land consisted of the testimony of E. H. Heilbron, a civil engineer in the employ of the appellant; the government contour map showing the elevation of the land; the gauge readings of the Illinois river at Henry and at Peoria; the testimony of David H. Dugan, another engineer, in connection with the map and the gauge readings; and the testimony of Peter Bestold and Frank Beaumaster, two witnesses for the appellee. Engineer Heilbron testified that he was familiar with the Illinois river and its tributaries and had made an investigation of the flow of the current from the controlling works at Lockport to the Eads bridge at East St. Louis, and that the 200,000 cubic feet of water which was turned into the Illinois river on January 17, 1900, would arrive at a point opposite the land of appellee in something less than four days. Bestold and Beaumaster were both residents of Lacon, who had lived there and in the vicinity for many years. Bestold was a farmer and Beaumaster a commercial fisherman. They were familiar

with the river, and both noticed the difference in the height of the water after the water was turned in by the sanitary district. Bestold testified that after the water was turned in, in 1900, there was not much of a change; in 1902 a big change. He did not notice any change in 1900 after February and March. The water stayed three and a half to four feet higher than it did before. He said that he remembered the condition of the Illinois river after January 17, 1900, and had testified to those conditions before. He had testified in cases of this character about twenty-five times. When the water was turned in, in the first year it rose in the first fifteen days about two feet. He could not say how much in the first ten days. It rose some from the time the water was turned in,—from the first few days. He had cattle in the bottoms and was interested watching the water. He had a bridge in where he could tell the rise. It rose about two feet and stopped. Beaumaster testified that he noticed the difference in the river and in the backwater after the sanitary district water was turned in,—he should think in about a week; and at another time he said when they first turned the water in he noticed a change in the river,—the start of it in three or four days.

Sheets 45 and 46 of a survey of the Illinois river, made under the direction of the War Department of the United States, showing the land in controversy, were introduced in evidence. These sheets show the elevation of the land in one-foot contours and refer to the Memphis datum. From the data which they contain the quantity of land which would be overflowed in various stages of the water was calculated and testified to by David H. Dugan, an engineer of the sanitary district. The daily gauge readings showing the elevation of the surface of the river at Henry and Peoria for many years before and after 1900 were introduced in evidence, and it was testified that the elevation of the surface of the water at Henry and that at a point opposite the land in question are the same. Based upon these gauge

299—6

readings and the contour map and his knowledge as an engineer the witness was able to testify to the level of the water each day between January 17 and January 30, 1900, upon the appellee's land and the quantity of it that was overflowed. He testified that for the fourteen days from January 17 to January 30, both inclusive, the elevation of the surface of the water above Memphis datum, in feet, was, respectively, 441.29, 441.94, 442.04, 443.34, 443.89, 444.14, 444.29, 444.04, 444.59, 444.64, 444.59, 444.59, 444.29, 444.24; and that the quantity of land overflowed on those respective days, in acres, was 30, 57, 61, 127, 164, 177, 183, 194, 196, 198, 196, 196, 183, 181 and 177. This is in accordance with the testimony of Heilbron that the water would arrive at a point opposite the appellee's land in something less than four days, and of Bestold and Beaumaster in regard to the rise within a week or ten days after the water was turned in. Other witnesses who testified to the rise in the river after the sanitary district water was turned in were unable to state when they first noticed the change and did not undertake to fix the time when it occurred.

The drainage canal is a permanent structure whose use and operation in the manner authorized by law were necessarily injurious to the appellee's land. The declaration did not complain of the manner of construction, operation or use of the canal or the works connected with it or of any negligence of the appellant, but alleged a permanent injury to the appellee's land caused by the existence, operation and use of the canal in the manner authorized by law. For such injury the person injured must recover all damages which he has sustained or will sustain in the future from the operation of the canal in the manner and to the amount then authorized by law in a single suit, and that suit must be brought within five years after the completion of the work and putting it in operation. (*Suehr* v. *Sanitary District,* 242 Ill. 496; *Vette* v. *Sanitary District,* 260 id. 432; *Shaw* v. *Sanitary District,* 267 id. 216; *Wheeler* v. *Sani-*

*tary District,* 270 id. 461.)    The parties by their pleadings
in this case have raised the issue of the limitation of the
action, not with reference to the time when the work was
completed and put in operation but with reference to the
time when the appellee's land was actually invaded by the
waters of the district.    It is not material that the water
did not at once render the land useless.    If the flow of
water in the river was increased, the cause of action was
complete, as we have held, when the work was complete
and put in operation.    The limitation under the pleadings
in this case, however, began to run when the increased
flow of water reached the appellee's land, and he was bound
to sue within five years of that time, not only for all the
damages which he had sustained but for all which he would
sustain thereafter or be barred from maintaining any action.

The evidence tends to show that the rise of two or three
feet between January 17 and January 30 was not an un-
usual rise; that the water had been higher before 1900 than
it was in that year; that the appellee was able to cultivate
the land in 1900 and 1901 and raise crops, and that it was
not until after 1901 that his land was overflowed so as to
deprive him of its use for farming and pasture.    The depth
of the water over the appellee's land would vary in accord-
ance with the variation in the quantity of water naturally
flowing in the river.    If the water naturally flowing in the
river in the crop seasons in 1900 and 1901 was such that
the addition of the water from the drainage canal would
not overflow the appellee's land to so great a depth that he
could not farm or pasture it in those seasons, this would
not affect his right of action for the turning of the water
into the river and raising the level above what it would have
been without the water so turned in.    The cause of action
which accrued by reason of the construction and operation
of the work was not affected by the fact that the full amount
of the damage which would be sustained did not accrue or
was not apparent immediately.

The court instructed the jury that if it appears by a preponderance of the evidence that prior to January 30, 1900, any water from the Illinois river invaded any portion of the appellee's land that it would not have invaded had not the sanitary district turned its flow into the Illinois river, the damages to the entire land described in the appellee's declaration occurred on the date when such invasion took place, and in that state of the proof the plaintiff can not recover. This instruction was more favorable to the plaintiff than he was entitled to. The evidence showed, without contradiction, that water from the Illinois river did invade the plaintiff's land which would not have been invaded had the sanitary district not turned its flow into the Illinois river, and the court should have instructed the jury to find a verdict for the defendant.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*